**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES RADFORD, on behalf of himself and others similarly situated, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 17-3381 |
| PEVATOR COMPANIES, LTD. d/b/a/ BRAKE CHECK, | § § § | |
| Defendant. | § § | |

**MEMORANDUM AND ORDER**[*]

The defendant, Brake Check (the trade name of Pevator Companies), asks the court to decertify a conditionally certified collective action for unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 216(b). (Docket Entry No. 92). James Radford, a Brake Check Service Manager, sued on behalf of himself and other Service Managers, alleging that Brake Check improperly classified them as exempt from the Act's overtime compensation requirements. (Docket Entry No. 77). This court conditionally certified a class of current and former Service Managers who worked at Brake Check during the three years before the filing of this lawsuit. (Docket Entry Nos. 19, 32). Radford and two of the opt-in plaintiffs, DaJuan Jones and Michael Murehead, also asserted retaliation claims under the Act. (Docket Entry No. 77 at ¶¶ 7.10–7.24). After representative discovery, Brake Check moved for decertification, for sanctions against Murehead, for summary judgment, and for attorneys' fees and costs. (Docket Entry Nos. 92, 99, 104).

---

[*] This Memorandum and Order cites ECF Docket Entry page numbers except in deposition citations, which refer to original transcript page and line numbers.

Based on the pleadings, the motions, the record, and the applicable law, the court grants Brake Check's motion for decertification, dismisses the claims of the plaintiffs other than Radford without prejudice, grants Brake Check's motion for summary judgment as to Radford's claims, and denies Brake Check's motion for sanctions. The statute of limitations as to the dismissed plaintiffs' claims is tolled until **February 25**, **2020**. Brake Check's requests for attorneys' fees and costs are denied. The reasons for these rulings are set out below.

## I.      Background

Brake Check is a chain automotive repair shop that does oil changes, brake work, and alignments. (Docket Entry No. 77 at ¶ 6.1). Brake Check locations have two operational structures. (Docket Entry No. 28-2 at 3). In the first structure, "the Store Director is the highest-level employee in charge of the store." (*Id.*). The Store Director reports to a Corporate Director located at a different Brake Check location. (*Id.*). Service Managers report to Store Directors and the Automotive Technicians report to Service Managers. (*Id.*). In the second operational structure, a Corporate Director manages the store without a Store Director and Service Managers report directly to the Corporate Director. (*Id.*). When the Store or Corporate Director is absent, the Service Manager runs the store. (*Id.*).

The plaintiffs are 45 Service Managers from Brake Check locations throughout Texas. After this court permitted discovery as to ten representative plaintiffs, Brake Check designated two individuals from locations in Austin, Corpus Christi, Houston, Missouri City, and San Antonio as the representative plaintiffs from whom it wanted discovery. (Docket Entry No. 57).[1] One representative plaintiff, Eric Sanchez, withdrew from the case. (Docket Entry No. 90).

---

[1] The representative plaintiffs are: Tyler Downey (Austin), David Tung (Austin), Albert Galvan (Corpus Christi), Jonathan Luna (Corpus Christi), Jerry Eskridge (Houston), Johnny Binder (Houston), Stuart Sawyer (Missouri City), Remigio Jesus Campirano (San Antonio), and Veronica Lopez (San Antonio). (*See* Docket Entry No. 92 at 6).

Discovery revealed some undisputed facts.  Each Service Manager had the same job description and the same pay schedule.  (Docket Entry No. 104-17 at 12–13).  Service Managers performed a variety of tasks, including making general car repairs, training new team members, interacting with customers, managing inventory, and ordering new parts.  *Id.*  Service Managers also assigned tasks to Automotive Technicians;[2] ensured that the Technicians safely performed their tasks;[3] opened and closed the stores;[4] and ran the stores when Store or Corporate Directors were absent.[5]  Service Managers are paid $600 per week plus a potential monthly bonus based on a store's profits.  (Docket Entry No. 106-18, Hakes Dep. at 24:20–21; Docket Entry 94-19 at 3; Docket Entry No. 104-17 at 13).

Brake Check deposed the nine remaining representative plaintiffs, plus opt-in plaintiff Stephen Gordon James and the three plaintiffs who asserted retaliation claims under the Act—Radford, Jones, and Murehead.  (Docket Entry No. 104 at 7–8).  Radford deposed Allen Hakes, Brake Check's Vice President of Operations and corporate representative for this case, and obtained over 4,000 pages of records from Brake Check.  (*Id.* at 8).  After the representative discovery, Brake Check moved to decertify the class, arguing that the class members are not similarly situated.  (Docket Entry No. 92).  Brake Check also moved for sanctions against Murehead, contending that his claims should be dismissed with prejudice because he committed

---

[2]  Docket Entry No. 106-3, Radford Dep. at 138:3–142:10; Docket Entry No. 106-7, Jones Dep. at 108:20–109:7; Docket Entry No. 106-10, James Dep at. 53:25–54:6; Docket Entry No. 106-33, Eskridge Dep. at 64:11–20; Docket Entry No. 106-34, Campirano Dep. at 39:7–10; Docket Entry No. 106-35, Downey Dep. at 54:16–23; Docket Entry No. 106-36, Lopez Dep. at 57:15–58:18.

[3]  Docket Entry No. 106-3, Radford Dep. at 84:25–85:19; Docket Entry No. 106-7, Jones Dep. at 105:21–106:1; Docket Entry No. 106-10, James Dep. at 136:24–137:7; Docket Entry No. 106-16, Luna Dep at 110:18–111:1; Docket Entry No. 106-20, Galvan Dep. at 69:16–19; Docket Entry No. 106-38, Sawyer Dep. at 51:14–16.

[4]  Docket Entry No. 106-10, James Dep. at 48:3–10; Docket Entry No. 106-13, Binder Dep. at 42:21–24; Docket Entry No. 106-16, Luna Dep. at 96:15–24; Docket Entry No. 106-20, Galvan Dep. at 93:18–20; Docket Entry No. 106-33, Eskridge, Dep. at 59:5–9; Docket Entry No. 106-36, Lopez Dep. at 32:11–13.

[5]  Docket Entry No. 106-3, Radford Dep. at 32:21–25; Docket Entry No. 106-7, Jones Dep. at 107:5–7; Docket Entry No. 106-38, Sawyer Dep. at 65:20–66:14.

perjury in his February 14, 2019, declaration.  (Docket Entry No. 99).  Finally, Brake Check moved for summary judgment, arguing that it properly classified the Service Managers as exempt from the Act's overtime requirements and that it fired the three Service Managers asserting retaliation claims for legitimate reasons.  (Docket Entry No. 104).

Each motion is analyzed below.

## II.    Decertification

Most courts in this circuit use the two-step *Lusardi* approach to determine whether employees are "similarly situated" for certification under § 216(b).  *Cruz v. Conocophillips*, 208 F. Supp. 3d 811, 815 (S.D. Tex. 2016) (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987)).  The Fifth Circuit has not defined "similarly situated" or endorsed a particular test, but it has affirmed district courts using the *Lusardi* method.  *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 518–21 (5th Cir. 2010); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213, 1216 (5th Cir. 1995), *overruling on other grounds recognized by Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 311 n.10 (5th Cir. 2004).  At the first stage, the court conditionally certifies the class based on minimal record evidence.  *Mooney*, 54 F.3d at 1213–14.  The court did that in this case. (Docket Entry No. 32).  "The second determination is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial."  *Mooney*, 54 F.3d at 1214.

When a motion to decertify is filed, the court must thoroughly review the evidence to determine whether the action should continue to proceed collectively.  *Id.  Lusardi* factors include: (1) the "factual and employment settings of the individual plaintiffs"; (2) whether "the various defenses available to [the defendant] . . . appear to be individual to each plaintiff"; and (3) fairness and procedural concerns (along with a factor specific to Age Discrimination in Employment Act

cases).  *Id.* at 1213 n.7 (citing *Lusardi*, 118 F.R.D. at 359).  If the class members are not similarly situated, the opt-in plaintiffs' claims are dismissed without prejudice, and the original party or parties may proceed individually.  *Id.* at 1214; *Acevedo*, 600 F.3d at 519; *see, e.g.*, *Buehlman v. Ide Pontiac, Inc.*, 345 F. Supp. 3d 305, 314–15 (W.D.N.Y. 2018) ("Defendants' motion for . . . decertification of the matter as a collective action . . . is granted . . . . The Opt-In Plaintiffs' claims are dismissed without prejudice, and the statute of limitations as to those claims is tolled for 30 days from entry of this Decision and Order.  Defendants are granted summary judgment as to Plaintiff's unpaid overtime claims under both the [Fair Labor Standards Act] and the [New York Labor Law].").

### 1.    The Factual and Employment Settings of the Individual Plaintiffs

The plaintiffs contend that Service Managers all held the same position in Brake Check, performed comparable work, and worked similar schedules.  (Docket Entry No. 94 at 4–12).  Brake Check argues that even if there is a common job description, each plaintiff's daily work is highly individualized depending on the Brake Check location where the plaintiff worked.  (Docket Entry No. 92 at 9–15).

While not specifically required by the Fifth Circuit, evidence of a common policy, plan, or practice is often critical to showing that all plaintiffs have a similar employment setting.  *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 535 (S.D. Tex. 2008).  "[A]t a minimum, there must be meaningful identifiable facts or [a] legal nexus [that] bind[s] the claims, . . . so that hearing the cases together furthers the purposes of section § 216, is fair to both parties, and does not result in an unmanageable trial."  *Id.* (quotation marks and citation omitted).  The plaintiffs had the same job title and written job description, but their daily responsibilities varied substantially.  *See Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 WL 772756, at *12 (S.D. Tex. Mar. 12,

2007) ("[E]mployees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' [Fair Labor Standards Act] class if their day-to-day job duties vary substantially.").

As explained above, Brake Check locations have two different managerial structures. Some locations have a Store Director; at other locations, the Service Managers report directly to a Corporate Director. Some Brake Check locations perform a wider range of automotive repair functions, such as strut services or transmission replacements, than others. (Docket Entry No. 106-18, Hakes Dep. at 56:6–25). The size of the locations and the customer volumes also vary. (Docket Entry No. 106-3, Radford Dep. at 111:6–113:9; Docket Entry No. 106-7, Jones Dep. at 136:23–137:14; Docket Entry No. 106-10, James Dep. at 85:14–86:12; Docket Entry No. 106-33, Eskridge Dep. at 27:4–28:7). At busier locations or times, or when Technicians were unavailable, short-staffed, or unable to do certain jobs, Service Managers spent more time working on cars. (Docket Entry No. 106-3, Radford Dep. at 101:5–102:13; Docket Entry No. 106-7, Jones Dep. at 137:21–139:8; Docket Entry No. 106-32, Tung Dep. at 36:22–37:17; Docket Entry No. 106-34, Campirano Dep. at 35:1–13; Docket Entry No. 106-36, Lopez Dep. at 64:22–67:24).

The plaintiffs' diverse testimony on the types and frequency of Service Managers' tasks shows that there was no common work routine among the class members during the class period. David Tung, a representative plaintiff from the Austin location, testified that he spent approximately 10 to 20% of his time servicing cars; Johnny Binder from Houston testified that he spent 85% of his time doing the same. (Docket Entry No. 106-32, Tung Dep. at 36:22–37:17; Docket Entry No. 106-13, Binder Dep. at 40:24–41:3). Remigio Jesus Campirano from the San Antonio location estimated that he spent approximately 20% of his time working on vehicles. (Docket Entry No. 106-34, Campirano Dep. at 35:1–13). Veronica Lopez, also from the San Antonio store, testified that the amount of time she spent on cars varied depending on how busy

6

the store was and who was on staff.   (Docket Entry No. 106-36, Lopez Dep. at 64:22–67:24).

Brake Check's policies allowed Service Managers to do a range of work.   (Docket Entry No. 106-

18, Hakes Dep. at 56:6–25; *but see* Docket Entry No. 106-7, Jones Dep. at 137:15–21 (not agreeing

that Service Managers' duties varied)).[6]

The plaintiffs have not identified a consistent plan by Brake Check to deny Service

Managers managerial responsibilities in favor of more menial work.   *See Johnson v. Big Lots*

*Stores, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008) ("Even though plaintiffs pitched their case

as involving a uniform policy or practice of misclassifying [Assistant Store Managers], they

produced no direct evidence suggesting a conscious corporate intention to deny [them] managerial

responsibilities.").   Jones testified that he believed Brake Check instructed Service Managers to

stay past their scheduled work hours so that they, not the Automotive Technicians, could work on

cars, because the Technicians got overtime and Managers did not.   (Docket Entry No. 106-7, Jones

Dep. at 96:7–25).   But the plaintiffs did not show that this was a consistent policy that Brake Check

enforced.   *See Falcon*, 580 F. Supp. 2d at 536 (denying decertification, in part, because all assistant

store managers worked off-the-clock or had time "shaved off" by their store managers).   Based on

---

[6]   The plaintiffs cite *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 740 (W.D. Tex. 2018). That Fair Labor Standards Act collective action involved plaintiffs who worked as "pressure control operators" for two merged firms servicing oil and gas companies.   The court denied the defendants' motion for decertification, concluding that even though different plaintiffs "performed specific tasks at different frequencies, [they] shared factual and employment settings beyond simply sharing the same job title."   *Id.*   The court emphasized that the plaintiffs "performed relatively similar work, worked similar hours, and possessed similar qualifications while receiving no overtime pay."   *Id. Snively* is distinguishable because, in that case, the tasks performed more or less often by individual plaintiffs—including "stage" jobs requiring extensive onsite work, less time-consuming towing jobs, and "hotshot runs" to provide relief to other workers—did not undermine the conclusion that the plaintiffs "primarily performed [similar] manual labor."   *See id.* at 739–40; W.D. Tex. Civil Action No. 15-134 Docket Entry No. 146, *Snively* Def.'s Mot. Decertify at 17–18, 26.   The *Snively* defendants acknowledged that "[the] Plaintiffs may have *generally* performed the same type of work," while arguing that "the ways they performed that work . . . varied by Plaintiff." W.D. Tex. Civil Action No. 15-134 Docket Entry No. 146, *Snively* Def.'s Mot. Decertify at 25.   Here, the Service Manager plaintiffs testified to spending different amounts of time on manual Technician duties, which are outside the executive work the Act exempts from overtime pay requirements.   The diverse testimony demonstrates that individual Service Managers had different factual and employment settings, inconsistent with collective treatment.

the disparate testimony and other record evidence, the court finds that the individual plaintiffs' job experiences were too diverse to sustain a collective action.

### 2.    The Defenses

Brake Check intends to invoke various exemption defenses if this case proceeds to trial. "Exemption defenses are 'the most fact-intensive' part" of a Fair Labor Standards Act lawsuit. *Kelly v. Healthcare Servs. Grp., Inc.*, 106 F. Supp. 3d 808, 828 (E.D. Tex. 2015) (quoting *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 689 (W.D. Tex. 2014)).    Considering the differences in the plaintiffs' testimony, trial on the exemption defenses would vary depending on the amount of time each plaintiff spent on nonexempt work.  *See Marshall v. Eyemasters of Tex., Ltd.*, 272 F.R.D. 447, 450 (N.D. Tex. 2011) (denying conditional certification under the more lenient standard of *Lusardi* step one because the declarations from the employees showed that "employees holding the same job title were performing different duties at different stores").

The plaintiffs argue that the court can adjudicate the exemption defenses collectively. (Docket Entry No. 94 at 24–26).  Collective adjudication of exemption defenses is proper when the plaintiffs assert homogenous facts.  *See Johnson*, 561 F. Supp. 2d at 586 ("[T]he dissimilarity of plaintiffs' self-reported job duties makes it exceedingly difficult for Big Lots to assert its statutory exemption defense on a collective basis."); *id.* at 587 ("One of the purposes of trying several overtime pay claims in a collective action is to avoid the inefficiencies of conducting multiple individual trials on the same factual and legal issues.").  The plaintiffs gave different accounts of the amount of time they spent on different tasks.  Without a more homogenous class, there can be no collective determination on the exemption defenses Brake Check asserts.  *Cf. Vanzzini v. Action Meat Distribs., Inc.*, 995 F. Supp. 2d 703, 723 (S.D. Tex. 2014) ("The kind of

highly factual, individualized inquiry that determining whether the MCA exemption applies to Mr.

Flanagan would require . . . counsels against including him in the certified class.").

### 3.      Fairness and Procedural Concerns

Collective actions often lower costs to plaintiffs, increase their access to relief, and

efficiently resolve claims involving common issues of law and fact. *See Hoffmann-LaRoche Inc.*

*v. Sperling*, 493 U.S. 165, 170 (1989). The burden and complexity a class action imposes on the

parties, the jury, and the court may frustrate these benefits. *See Lusardi*, 118 F.R.D. at 370–71

(discussing "serious questions . . . concerning the fairness, manageability and meaningfulness of

[many] separate jury trials under the guise of a class action before a single jury). When the claims

involve individualized legal or factual determinations, the burdens may outweigh the benefits. *See*

*id.* District courts have "substantial discretion" to "define, redefine, subclass, and decertify as

appropriate in response to the progression of the case from assertion to facts." *Richardson v. Byrd*,

709 F.2d 1016, 1019 (5th Cir. 1983); *Snively v. Peak Pressure Control, LLC*, 347 F. Supp. 3d 294,

301 (W.D. Tex. 2018).

Adjudicating Brake Check's exemption defenses will require fact-intensive mini trials too

variable to be addressed by creating subclasses. *See Agostino v. Quest Diagnostics Inc.*, 256

F.R.D. 437, 471 (D.N.J. 2009), *overruled on other grounds by Maniscalco v. Brother Intern. (USA)*

*Corp.*, 709 F.3d 202, 207–08 (3d Cir. 2013) ("The Court concludes that there are too many

individualized issues of fact for the . . . Subclass to be considered cohesive."). In one case

involving exemption defenses, *Johnson*, 561 F. Supp. 2d at 570, the court held a bench trial with

43 hours of live testimony and presentations from attorneys, more than 40 witnesses, and more

than one thousand exhibits. The court decertified the collective action because ruling on the merits

would be "fundamentally unfair to both sides." *Id.* at 588; *see Snively v. Peak Pressure Control,*

*LLC*, 314 F. Supp. 3d 734, 743–44 (S.D. Tex. 2018) (discussing *Johnson* as a "cautionary tale"). The risk of waste is greater here because the trial would be to a jury, making it more difficult to manage.  *See Snively*, 314 F. Supp. 3d at 743 (a bench trial provides flexibility "in juggling a potentially complex case").  The record does not show that the plaintiffs are similarly situated enough to continue to proceed as a collective action.

Brake Check's motion to decertify is granted.  The plaintiffs other than James Radford are dismissed without prejudice.  This case is now an individual action on behalf of Radford.

"[T]he statute of limitations for the putative class members resumes running when . . . a certified class is decertified."  *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 375 (5th Cir. 2013) (citing *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983)).  "In order to avoid prejudice to opt-in plaintiffs, courts may toll the statute of limitations in [Fair Labor Standards Act] collective actions that have been decertified, and they often do so in cases involving many opt-in plaintiffs."  *McEarchen v. Urban Outfitters, Inc.*, No. 13-CV-3569, 2017 WL 3912345, at *2 (E.D.N.Y. Sept. 6, 2017) (collecting cases and tolling for 60 days when there were 165 opt-in plaintiffs); *see also Buehlman* 345 F. Supp. 3d at 313–15 (tolling for 30 days when there were two opt-in plaintiffs in a matter that was "not . . . particularly complex").  A 45-day tolling period would be appropriate in this case, which involves 44 plaintiffs other than Radford, but the court adds an extra 15 days to account for the holidays.  The statute of limitations as to the dismissed plaintiffs' claims is tolled until **February 25, 2020**.

## III.    Summary Judgment

The summary judgment motion is now examined against Radford.  The relevant facts are those pertaining to his individual claims.  The court cites other Service Managers' testimony to provide additional information and context.

in favor of the nonmoving party. *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1769 (2015).

### B.    The Overtime Claims and the Executive Exemption

Section 216(b) of the Act allows suits to recover overtime pay "against any employer . . . by any one or more employees for and [o]n behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  The plaintiffs assert that Brake Check improperly classified Service Managers as employees exempt from the Act's overtime pay provisions. (Docket Entry No. 77 at ¶ 7.7).  Brake Check asserts that its Service Managers fall under the executive or combination exemptions to the Act's overtime pay provisions.  (Docket Entry No. 104 at 21–25).  The plaintiffs respond that their primary work for the company involved nonexempt tasks such as servicing cars, not managing other employees.  (Docket Entry No. 106 at 27).

The Supreme Court stated recently that exemptions to the Act should not be construed narrowly, but rather given a "fair reading" as equal parts of the statute.  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).  While each exemption requires a searching review of the factual record, whether an employee is exempt from the Act is a question of law.  *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000).  "'An employer claiming an exemption bears the burden of proving that the exemption claimed is valid.'"  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 678 (W.D. Tex. 2014) (quoting *Heidtman v. Cty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999)).

Executive employees are exempt from the Act's overtime compensation requirements.  29 U.S.C. § 213(a)(1).  Determining whether an employee is an executive under the Act "is a highly fact-intensive and nuanced inquiry into the particular circumstances of the employee's job." *Johnson*, 561 F. Supp. 2d at 584.  The executive exemption generally applies to employees: (1)

with salaries of more than $455 per week (at the time Radford worked at Brake Check);[7] (2) whose primary duty is management of the enterprise or one of its subdivisions; (3) who customarily direct the work of two or more employees; and (4) who have authority to hire or fire other workers or whose suggestions and recommendations as to employment decisions are given particular weight. *Ferrara v. 4JLJ, LLC*, 150 F. Supp. 3d 813, 819 (S.D. Tex. 2016) (citing 29 C.F.R. § 541.100).

Each of these elements is addressed below.

### 1.      Radford's Compensation

Brake Check Service Managers, including Radford, received a weekly salary of over $455. (Docket Entry No. 106-18, Hakes Dep. at 24:20–21).  The first element of the exemption is met.

### 2.      Radford's Primary Duty

To qualify for the executive exemption, an employee's primary duty must be the management of the business or a subdivision of that business.   29 C.F.R. § 541.100(a)(2). Examples of managerial activities include:

> interviewing, selecting, and training . . . employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

---

[7]   A higher salary requirement is scheduled to go into effect on January 1, 2020.  *See* 29 C.F.R. § 541.100(a)(1).

"An employee's 'primary duty' is management if it is the 'principal, main, major or most important duty that the employee performs.'"  *Johnson*, 561 F. Supp. 2d at 575 (quoting 29 C.F.R. § 541.700(a)).  "Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but time is not the only factor.  29 C.F.R. § 541.700(b).  "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if . . . other factors support such a conclusion.'"[8]  *Id.*  Other factors include "(1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's relative freedom from supervision, and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor."  *Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001).  Each factor is considered below.

### i.    The Importance of the Managerial Duties

Radford argues that Service Managers spend much of their time working on cars and performing other nonexempt manual labor.  (Docket Entry No. 106 at 25).  Radford testified that he worked on cars in some capacity every day, that sometimes he spent "all day" working on vehicles, and that he performed the work of a Technician in the morning approximately three to four times per week, despite having the title of Service Manager.  (Docket Entry No. 106-3,

---

[8]  *See, e.g., Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 707 n.56 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014), *abrogation on other grounds recognized by Amaya v. NOYPI Movers, L.L.C.*, 741 F. App'x 203, 205 n.2 (5th Cir. 2018) (an employee's primary duty was management because, even though he may have spent less than 50% of his time managing others, his oversight duties were "crucial" to the employer's business); *Noble v. Dolgencorp, Inc.*, 944 F. Supp. 2d 532, 539 (S.D. Miss. 2010) (an employee's primary duty was management because, even though she may have spent less than half of her time on managerial duties, her deposition testimony showed that her primary duty was managing the store); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866–67 (N.D. Tex. 2001) (even though an employee claimed that he spent 90% of his time on nonexempt work, his primary responsibility to the company was management).

Radford Dep. at 94:14–102:20, 215:9–11).  However, he did not specify how often he spent entire days working on cars.  (*See id.*).

Radford cites DaJuan Jones's testimony that Service Managers can work after hours without getting overtime pay, reducing Brake Check's labor costs.  (Docket Entry No. 106 at 26 n.106 (citing Docket Entry No. 106-7, Jones Dep. at 96:7–25)).  Radford also points to Johnny Binder's testimony that he spent 85% of his time working as an Automotive Technician, despite his title of Service Manager.  (*Id.* at 26 n.105 (citing Docket Entry No. 106-13, Binder Dep. at 40:24–41:3)).  These statements, Radford argues, show that a Service Manager's primary function for Brake Check was to work on nonexempt Technician tasks.  *Id.* at 25–27.

Other representative plaintiffs testified that working on cars was a smaller part of their jobs. David Tung testified that he spent approximately 10 to 20% of his time servicing vehicles.  (Docket Entry No. 106-32, Tung Dep. at 36:22–37:17).  Remigio Jesus Campirano estimated that he spent 20% of his time doing the same.  (Docket Entry No. 106-34, Campirano Dep. at 35:1–13). Between the extremes, Jones testified that on average he would spend 30 to 35% percent of his time working on cars.  (Docket Entry No. 106-7, Jones Dep. at 187:10–22).

Radford and others testified that even if they spent significant time working on cars, they also spent significant time on managerial tasks.[9]  Radford testified that "when the store director is out, then the service manager takes over as store director"; he also agreed that he negotiated with parts suppliers, trained new employees, supervised Technicians, provided disciplinary recommendations to the Store Director, and delegated tasks to Technicians.  (Docket Entry No. 106-3, Radford Dep. at 32:21–25, 47:21–25, 83:18–85:19, 120:16–125:25, 138:3–140:17, 141:11–142:22).  Binder, who testified that he worked on cars 85% of the time, agreed that he trained

---

[9]  *See supra* notes 2–5.

15

Technicians, spoke to job applicants, provided disciplinary recommendations, and handled customer complaints.  (Docket Entry No. 106-13, Binder Dep. at 43:4–7; 45:6–16; 51:1–14).

Radford acknowledged the significance of his managerial responsibilities.  He described selling service jobs to customers and the importance of a Service Manager's work to each store's profitability.  (Docket Entry No. 106-3, Radford Dep. at 35:19–45:11; *see also* Docket Entry No. 106-7, Jones Dep. at 99:3–13; Docket Entry No. 106-16, Luna Dep. at 64:25–72:18; Docket Entry No. 106-34, Campirano Dep. at 27:13–28:21).  Radford also discussed his ability to increase Brake Check's profits by negotiating lower prices for parts from different parts houses.  (Docket Entry No. 106-3, Radford Dep. at 47:1–25; *see also* Docket Entry No. 106-7, Jones Dep. at 89:3–10; Docket Entry No. 106-10, James Dep. at 72:18–73:11 (James used the term "price match" rather than "negotiate"); Docket Entry No. 106-32, Tung Dep. at 29:6–30:12; Docket Entry No. 106-33, Eskridge Dep. at 80:3–21; Docket Entry No. 106-36, Lopez Dep. at 30:13–22).  He agreed that he supervised Automotive Technicians.  (Docket Entry No. 106-3, Radford Dep. at 81:7–84:13); *see also supra* notes 2–3.  All this evidence supports deciding that Radford's managerial duties were more important to Brake Check than his other duties.

### ii.     Discretionary Powers and Freedom from Supervision

The record demonstrates that Radford exercised discretion often and did discretionary tasks without significant oversight.  Service Managers, including Radford, were in charge of delegating day-to-day vehicle servicing tasks to Automotive Technicians.  (Docket Entry No. 106-3, Radford Dep. at 138:3–142:10); *see also supra* note 2.  Radford described spending roughly 20 hours per week negotiating with parts suppliers.  (Docket Entry No. 106-3, Radford Dep. at 50:11–23).  This evidence supports deciding that Radford's managerial duties were more important to the company than his Technician responsibilities.

16

Radford argues that Service Managers were not managerial employees because they were not the highest-ranking employees in each store and they had to follow Brake Check "policies, procedures[,] and scripts." (Docket Entry No. 106 at 30–31). But Radford testified that even though he received direction from upper management, his own interactions with customers affected store revenues. (Docket Entry No. 106-3, Radford Dep. at 43:8–13). Radford explained that he could "[g]o off the script" when making a sales pitch. (*Id.* at 171:23–172:9). According to DaJuan Jones and Stuart Sawyer, Service Managers ran the stores on their own approximately one-and-a-half days per week, without direct supervision. (Docket Entry No. 106-7, Jones Dep. at 194:4–8; Docket Entry No. 106-38, Sawyer Dep. at 65:20–66:14; *see also* Docket Entry No. 106-3, Radford Dep. at 32:21–25; *contra* Docket Entry No. 106-13, Binder Dep. at 79:2–23 ("As far as being in charge of the store, I made no decisions or anything like that. If you had any problems, you would have to speak to the store director . . . . I can't speak on other Brake Check[] [locations].")). This evidence supports ruling that Radford's primary duties were managerial. *See Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001) (an employee does not need to have unfettered authority to qualify for the executive exemption); *see also Phillips v. Tacala, LLC*, 883 F. Supp. 2d 1138, 1154 (N.D. Ala. 2012) ("If mandatory compliance with corporate policies was enough to place a manager outside the executive exemption, the number of people eligible for the exemption would be very few indeed.").

### iii.    Radford's Salary and the Wages Paid to Other Employees

Radford contends that Lead Technicians who got overtime received compensation similar to that paid to Service Managers working the same number of hours. (Docket Entry No. 106 at 31–32 (citing Docket Entry No. 106-16, Luna Dep. at 132:6–133:18 and *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 508–09 (6th Cir. 2007))). Service Managers earned $600 per

week plus a potential monthly profit-sharing bonus.  (Docket Entry No. 106-18, Hakes Dep. at 24:20–21; Docket Entry No. 94-19 at 3; Docket Entry No. 104-17 at 13).  This bonus allowed Service Managers to earn over 75% more than their salaries would indicate.  (Docket Entry No. 92 at 16 n.73; Docket Entry No. 92-13 at 7 (pay stub for a Service Manager who received a $1,867.05 profit-sharing bonus in one month in addition to $2,400 in salary)).  Even though Lead Technicians could earn a similar wage per hour, they were not eligible for the Service Managers' bonus.  (Docket Entry No. 104-17 at 8–11); *see Thomas*, 506 F.3d at 508–09 (accounting for a store bonus program when calculating a plaintiff's salary).  Radford and others may have earned less than the Lead Technicians on occasion, but overall, the consistency of a salary and the chance for a bonus show that Service Managers had a better compensation package than Technicians.  *See Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1336 (N.D. Ga. 2005) ("As salaried employees, Plaintiffs received the same pay even if they worked less than 40 hours, and they were eligible for bonuses for which hourly employees were not.").

The record demonstrates that Radford's primary duty was management, even if he also spent substantial time on nonexempt duties.

### 3.    Directing Two or More Employees

The third element of the executive exemption is that the employee "customarily and regularly directs the work" of at least two other employees.  29 C.F.R. § 541.100(a)(3).  "'[C]ustomarily and regularly' means a frequency that [is] greater than occasional but . . . [that] may be less than constant."  29 C.F.R. § 541.701.  "[I]solated or one-time tasks" are insufficient.  *Id.*

Radford testified that he delegated tasks to Automotive Technicians, supervised the Technicians' work, and trained them.  (Docket Entry No. 106-3, Radford Dep. at 83:18–85:19,

138:3–140:17).  Brake Check's job description for the Service Manager position lists training new Technicians and administering safety procedures as core elements of the position.  (Docket Entry No. 94-19 at 2).  And Radford does not dispute that he and other Service Managers ran stores approximately one-and-a-half days a week, when the Store Managers were gone.  (Docket Entry No. 106 at 31; Docket Entry No. 106-3, Radford Dep. at 32:21–25; *see also* Docket Entry No. 106-7, Jones Dep. at 194:4–8; Docket Entry No. 106-38, Sawyer Dep. at 65:20–66:14).

This evidence shows that Radford customarily—*i.e.*, more than occasionally—directed the work of at least two others.  *See* 29 C.F.R. § 541.701.

### 4.    Hiring or Firing Power

Finally, executive employees must have the ability "to hire or fire other employees," or, at least, have their suggestions on employment decisions carry "particular weight."  29 C.F.R. § 541.100(a)(4).  Relevant factors include: (1) whether part of the employee's job is to make such recommendations; (2) the frequency with which those recommendations "are made or requested"; and (3) the frequency with which the recommendations are followed.  29 C.F.R. § 541.105.  Occasional suggestions do not meet this prong of the test, but an employee does not need final decision-making authority.  *Id.*; *see Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D. Tex. 2011) ("[T]here is often a hierarchy in any organization wherein supervisors have persons to whom they must report, and the fact that an individual does not have final supervisory authority does not take that person out of the realm of being a manager in the organization."); *Kastor*, 131 F. Supp. 2d at 865 ("If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations.").

Radford testified that he could not hire or fire, recommend that an employee be fired, or set someone's pay.  (Docket Entry No. 106-3, Radford Dep. at 123:7–124:16, 146:19–148:20, 200:25–201:4).  He said that he gave his opinion on one job applicant and he was unsure if the Store Director followed the suggestion.  (*Id.* at 147:4–148:20).  But even if Radford had no independent hiring or firing power, he testified that he had the ability to write up Automotive Technicians and that the number of write-ups could influence a Store Director's decision to fire a Technician.  (*Id.* at 120:16–125:25).  Others described having similar or greater authority.  (Docket Entry No. 106-7, Jones Dep. at 107:16–108:2 (agreeing that if Jones "wrote up technicians enough times, that . . . could ultimately get them fired because of all the write-ups in their file" and that Jones had input in termination decisions); Docket Entry No. 106-32, Tung Dep. at 16:3–8, 60:22–24 (agreeing that an employee could be fired after receiving multiple write-ups); *see also* Docket Entry No. 106-16, Luna Dep. at 33:16–23 (agreeing that, as a Service Manager, Luna could recommend termination; that such a recommendation would not be uncommon; and that Luna "fully expected that person to be fired" based on his recommendation); Docket Entry No. 106-34, Campirano Dep. at 52:20–53:7 (stating that Campirano recommended that two employees be terminated and that both were fired pursuant to his recommendation); Docket Entry No. 106-35, Downey Dep. at 25:4–17 (agreeing that Downey could recommended that technicians be disciplined and that his recommendation was usually followed)).

Radford did not specify how frequently he wrote up employees.  (Docket Entry No. 106-3, Radford Dep. at 122:5–10).  The ability to write up employees by itself may not mean that a reprimand is given particular weight.  *See Ferrara v. 4JLJ, LLC*, 150 F. Supp. 3d 813, 818–19 (S.D. Tex. 2016) (denying summary judgment on the executive exemption in a case involving an employee who handled one write-up).  But an employee's recommendation need not be followed

every time to be "given particular weight." *See King v. Stevenson Beer Distrib. Co.*, 11 F. Supp. 3d 772, 783 (S.D. Tex. 2014) (the plaintiff's recommendations were given particular weight because his job description included the ability to write up employees, he occasionally asked the manager to discipline employees, and although his recommendations were not always taken seriously, similar recommendations from other team leaders were often followed).

The record shows that while Radford's opinions on other employees were only one factor in employment decisions, they were still given particular weight, especially because Radford agreed that the number of write-ups could impact disciplinary decisions.

 The evidence in the record supports concluding that Radford was paid a salary of over $455 a week; was primarily a manager; customarily oversaw at least two other employees; and had input on the disciplinary process for Automotive Technicians.  Because undisputed record evidence—including Radford's own testimony—shows that the executive exemption applies, Brake Check's motion for summary judgment on the overtime claims is granted as to Radford. The court need not address the parties' arguments about the combination exception.

### B.     The Retaliation Claims

Radford also asserts a retaliation claim.  (Docket Entry No. 77 at ¶ 7.10).  He emphasizes that Brake Check fired him, DaJuan Jones, and Michael Murehead after they joined the lawsuit. (*Id.* at ¶¶ 7.21–7.23; Docket Entry No. 106 at 19).  Brake Check counters that even if Radford proves temporal proximity between the terminations and participation in this lawsuit, Brake Check fired him for legitimate, nonretaliatory reasons.  (Docket Entry No. 104 at 25–27).

The Act allows an employee to sue for retaliation if the employee is fired for filing "any complaint . . . under or related to this chapter."  29 U.S.C. § 215(a)(3).  Without direct evidence of retaliation, an employee's retaliation claim is subject to the *McDonnell Douglas* burden-shifting

framework used in Title VII cases.  *See Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 577 (5th Cir. 2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The elements of a *prima facie* retaliation claim are: "(1) participation in protected activity under the [Act]; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) (quoting the district court). If the plaintiff meets this initial burden, then the defendant must offer a legitimate reason for its decision.  *Id.*  If the defendant does so, the burden then shifts back to the plaintiff to show that the defendant's reason is a pretext for retaliation.  *Id.*

Assuming for the purpose of this motion that Radford made a *prima facie* showing of retaliation, Brake Check has supplied legitimate reasons for firing him, and Radford offers no evidence raising a material factual dispute as to pretext.

In December 2017, one month after Radford filed his original complaint in this lawsuit, his supervisor, Darrick Carter, wrote him up for unacceptable work performance.  (Docket Entry No. 104-17 at 17).[10]  Carter demoted Radford to Lead Technician and transferred him to a different Brake Check location.  (*Id.*).  Carter's plan for Radford stated that Brake Check Corporate Director Gus Baldovino would provide Radford with further training and that Radford could regain his role as Service Manager if a position was available.  (*Id.*).  Radford's performance did not improve. Baldovino wrote Radford up in March 2018 for losing the right rear caliper bolt of a customer's car.  (*Id.* at 22).  The write-up stated that "James [Radford] is a good tech and understands the importance of safety for our customers. If [another infraction occurs] with a situation concerning safety while working on a customer's [vehicle,] termination can or will be executed."  (*Id.*). Baldovino fired Radford in July 2018, when a customer's brakes locked up and almost caused a

---

[10]  Radford's brief claims that he "faced adverse action just days after joining the lawsuit," but does not elaborate.  (*See* Docket Entry No. 106 at 41).

wreck after Radford had serviced the car.  (*Id.* at 20).  The termination report stated that the left front caliper bolts were missing, causing the brakes to lock, and that Radford had made repeated mistakes with caliper bolts.  (*Id.*).

Radford claims that while the ticket showed that he worked on the car in July 2018, he did not finish the work and was not responsible for the missing bolts that led to the malfunction. (Docket Entry No. 106-31, Second Radford Dep. at 15:13–16:22).  When asked who finished the work on the car, Radford stated that he did not know.  (*Id.* at 16:4).  When asked why he believed he was fired, Radford testified that Brake Check "wanted [him] out of there" and said that he could not be more specific.  (*See id.* at 10:18-11:10).  Radford's assertion does not raise a material factual dispute as to, or support the inference of, pretext.  *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 324 (5th Cir. 2002) ("Merely disagreeing with an employer's negative performance assessment is insufficient to show pretext.").

Radford counters that the proximity between his termination and his original complaint shows pretext, especially considering that Baldovino knew about the lawsuit and Radford had no comparable disciplinary history before the lawsuit.  (Docket Entry No. 106 at 19–20).  Temporal proximity between protected action and an adverse employment action is indirect, but itself inconclusive, evidence of pretext.  *See Gee v. Principi*, 289 F.3d 342, 346 n.3 (5th Cir. 2002) (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)) (temporal proximity is "part of [the] analysis, but not in itself conclusive" to establishing the causal link for retaliation). "'[T]emporal proximity alone is insufficient' to survive summary judgment at the pretext stage in the absence of 'other significant evidence of pretext.'"  *Musser v. Paul Quinn College*, No. 19-10042, 2019 WL 6694578, at *6 (5th Cir. Dec. 23, 2019) (quoting *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 334 (5th Cir. 2017) (per curiam)).

Radford agreed that he could have been fired when Baldovino wrote him up for losing a customer's caliper bolt in March 2018. (Docket Entry No. 106-31, Second Radford Dep. at 22:17–23:10). He also agreed that the March 2018 write-up stated that if he made another safety mistake, he would be fired. *Id.* Brake Check submitted ample evidence that Baldovino fired Radford based on his job performance, and Radford did not identify evidence creating a factual issue as to pretext. *See Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 218 (5th Cir. 2016) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)) ("'Job performance is a legitimate . . . reason for termination.'"). Brake Check's motion for summary judgment as to Radford's retaliation claim is granted.

The other two retaliation claims lack evidence of pretext that could support Radford's claim. Over a year after DaJuan Jones joined this lawsuit,[11] his supervisor, Joseph Goddard, fired him for two instances of labor theft. (Docket Entry No. 104-17 at 26). According to Jones's termination report, Jones told a customer to bring a car part in on a Sunday and pay him cash to install it. (*Id.*) Jones testified that he told the customer that he would "charge [her] cash" before changing his testimony a few moments later to state that he did not tell her to bring cash. (Docket Entry No. 104-14, Jones Dep. at 234:25–236:15, 241:23–25). He also denied telling her to come in on a Sunday. (*Id.* at 242:1–2).

Jones's termination report states that Jones also stole labor by accepting cash for an oil change. (Docket Entry No. 104-17 at 26). When the customer came back for another oil change, she reported to another employee that she had paid cash for the previous job. (*Id.*). Goddard wrote in the report that, when confronted with this evidence, Jones said "[there is] nothing I can say about

---

[11] The plaintiffs also emphasize that the termination happened "close in time" (*i.e.*, about three months) after defense counsel deposed Jones. (Docket Entry No. 104-17 at 26; Docket Entry No. 106 at 41; Docket Entry No. 106-7, Jones Dep. at 5:2).

that one." (*Id.*).  Jones testified that he did not say that.  (Docket Entry No. 104-14, Jones Dep. at 230:21–24).  Goddard fired Jones after this conversation.  (Docket Entry No. 104-17 at 26).  When asked why his version of two events did not match the customers', he responded that the customers were lying and at least one of them was trying to get free car service.  (*Id.* at 246:12–247:19, 250:12-22).

Jones testified about another employee, Shannon, who was caught taking cash for side jobs but denied it and was not fired.  (*Id.* at 248:6–249:24).  Disparate treatment is evidence of pretext if the employment situations are "nearly identical."  *Lee v. Kan. City So. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).  Unlike in Jones's situation, in which both customers verified the misconduct, no one provided corroborating evidence linking Shannon to misconduct.  (Docket Entry No. 104-14, Jones Dep. at 249:25–250:11).  Jones admitted that the situation with Shannon was different. *Id.*  The evidence about Jones does not create a fact issue as to Radford's retaliation claim.

The evidence as to Murehead is similar.  Brake Check presented evidence that Murehead incorrectly overcharged a customer for car work that was not done.  (Docket Entry No. 104-17 at 38).  Henry Starling, a technician working under Murehead, reported that Murehead told him to continue the job even though they did not have the tools to do the work properly.  (*Id.*).  Starling, feeling uncomfortable with the situation, contacted Murehead's supervisor, Daniel Tomlin, to review the customer's invoice.  (*Id.*).  Tomlin found that Murehead had overcharged the customer by $230.28.  (*Id.* at 32; Docket Entry No. 106-43, Murehead Dep. at 92:15–17).  He talked to Murehead, suspended him, and fired him after further investigation.  (Docket Entry No. 104-17 at 38; Docket Entry No. 104-18 at 3).  Murehead admitted that the customer was charged for unperformed work.  (Docket Entry No. 106-43, Murehead Dep. at 90:18–21).  He testified that he tried to remove the charge from the invoice, but another Brake Check employee put it back in as

Murehead had entered it initially.  (*Id.* at 91:4–25).  Murehead emphasizes that he was fired just over two weeks after the plaintiffs' counsel notified the defendants that Murehead wanted to join the lawsuit.  (Docket Entry No. 104-18 at 3; Docket Entry No. 106 at 21–22; Docket Entry No. 106-41).  But on this record, Murehead's retaliation claim does not help Radford's or raise a fact issue as to pretext.  *See Principi*, 289 F.3d at 346 n.3.

Brake Check's motion for summary judgment on the retaliation claims is granted as to Radford.  Murehead's and Jones's claims are dismissed without prejudice.

## IV.    Sanctions

Brake Check asks this court to dismiss all of Murehead's claims with prejudice based on an allegedly perjured statement Murehead made in his declaration.  (Docket Entry No. 99).  Brake Check also requests attorneys' fees and costs in bringing the sanctions motion.  (*Id.* at 7).  Murehead responds that the motion for sanctions should be denied because he lied in his declaration to protect a fellow employee; the misstatement does not materially affect his retaliation claim; and because Murehead was not trying to deceive the court.  (Docket Entry No. 100 at 3–4).

Murehead's declaration does contain an inaccurate statement.  But this statement did not materially affect Murehead's claim, substantially delay the proceedings, or constitute a pattern of resisting the court's authority.

A "dismissal with prejudice 'is an extreme sanction that deprives a litigant of the opportunity to pursue his claim.'"  *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011) (per curiam) (quoting *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995)).  Dismissal with prejudice is appropriate if "(1) there is 'a clear record of delay or contumacious conduct by the plaintiff,' and (2) 'lesser sanctions would not serve the best interests of justice.'"  *Id.* (emphasis omitted) (quoting *Sturgeon v. Airborne Freight Corp.*, 778 F.2d 1154, 1159 (5th Cir.

26

1985)).  It is bad faith, "not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; . . . '*the stubborn resistance to authority*' . . . justifies a dismissal with prejudice." *Id.* (quoting *McNeal v. Papasan*, 842 F.2d 787, 792 (5th Cir. 1988)).  Courts resort to such a severe sanction when a plaintiff exhibits a pattern of bad behavior or when the plaintiff's lies materially affect his or her claims.  *See Woodson*, 57 F.3d at 1418; *Sarco Creek Ranch v. Greeson*, 167 F. Supp. 3d 835, 846 (S.D. Tex. 2016) (the court dismissed the case with prejudice after a plaintiff submitted fabricated evidence and lied at a show-cause hearing).

Murehead's conduct does not demonstrate "stubborn resistance to authority."  Instead, it shows his misconceptions of the legal process and misplaced concern for his fellow employee.  In his declaration, Murehead stated that he delayed joining the lawsuit for fear of retaliation.  (Docket Entry No. 73-2).  He claimed that Brake Check Corporate Director Brian Smith told him that Operations Director Armando Flores had stated that those who joined the lawsuit would be fired. (*Id.*).  During his deposition, however, Murehead stated that another Brake Check employee, Russell Weeks, told him about Flores's statement, not Brian Smith.  (Docket Entry No. 106-43, Murehead Dep. at 120:7–122:25).  Murehead explained that he did not want to use Weeks's name in his declaration because he did not want his statement to affect Weeks's employment.  (*Id.*). Brake Check argues that this discrepancy is a "grave abuse of the judicial process" and should result in the dismissal of Murehead's claims.  (Docket Entry No. 99 at 7).  But such an extreme action is not warranted.  Regardless of who told Murehead about the alleged statement by Flores, Murehead feared retaliation in part because of what he heard about the statement.  And Murehead rectified his mistake in his subsequent deposition, admitting the error on the record with minimal

27

delay or pressure from Brake Check's attorney.  (Docket Entry No. 106-43, Murehead Dep. at 120:7–122:25).  The motion for sanctions is denied.

## V.      Attorneys' Fees and Costs

Brake Check is not entitled to attorneys' fees or costs based on Murehead's conflicting statements or the plaintiffs' overall conduct in this case.  Fees are awarded when a party has litigated in bad faith or willfully disobeyed the court, and there is no evidence of such conduct here.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).  The requests for attorneys' fees and costs in Brake Check's motions for summary judgment and for sanctions are denied.

## VI.    Conclusion

The court finds, after representative discovery and on the expansive record, that the conditionally certified class is not similarly situated; grants Brake Check's motion to decertify (Docket Entry No. 92); and dismisses the opt-in plaintiffs' claims without prejudice.  The statute of limitations as to the dismissed plaintiffs' claims is tolled until **February 25, 2020**.  The court grants Brake Check's summary judgment motion, (Docket Entry No. 104), as to Radford.  Finally, the court denies Brake Check's motion for sanctions, (Docket Entry No. 99).

SIGNED on December 27, 2019, at Houston, Texas.

_____
                Lee H. Rosenthal
        Chief United States District Judge

28